| | |
|---|---|
| F.V. AND M.V. O/B/O B.V.<br><br>Petitioner,<br><br>V.<br><br>CHERRY HILL TOWNSHIP BOARD OF EDUCATION<br><br>Respondent. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>CIVIL ACTION NO.: 1:21-CV-18096-KMW-SAK<br><br>Civil Action<br><br>**DEFENDANT'S LOCAL R.56.1 STATEMENT OF FACTS** |

1. Petitioners F.V. and M.V. are the parents of B.V., who was a kindergarten student in the Cherry Hill Township School District ("District") during the 2020-2021 school year. (**Exhibit A**, p. 5)

2. Petitioners filed a request for a due process hearing under the Individuals with Disabilities Education Act ("IDEA") in the Spring of 2020 in order to resolve a disagreement over the educational program proposed by the District for B.V.'s 2020-2021 kindergarten school year. (**Exhibit A**, p. 2)

## The Original Petition of May 8, 2020

3. On March 30, 2020, the parties convened a virtual Eligibility Determination and IEP Annual Review Meeting to review B.V.'s recent evaluations in order to determine B.V.'s upcoming eligibility and to develop her IEP for the 2020-2021 kindergarten school year. The final IEP shared with Petitioners recommended a self-contained classroom as the proposed location for B.V.'s kindergarten special education program. (**Exhibit A**, p.6)

4. Petitioners rejected the March 30, 2020 IEP and on May 8, 2020 filed a mediation request with the New Jersey Department of Education, seeking placement in an

        inclusion classroom setting for B.V.'s kindergarten school year. Attached to the mediation request was a letter from a private medical provider, Dr. Mary Pipan, which recommended placement of B.V. in a general education setting. (**Exhibit A**, p. 8-9)

5. The parties participated in a mediation session, but were unable to resolve the dispute. As such, Petitioners sent a letter to the New Jersey Department of Education on June 9, 2020 requesting conversion of their mediation request to a due process petition. (**Exhibit A**, p. 2)

### The Emergent Relief Request of July 9, 2020

6. On July 9, 2020 the Petitioners, through counsel, filed a petition for emergent relief along with a new petition for due process as the underlying dispute. The emergent relief petition sought an order enforcing the petitioners' "stay put" rights to continued services as described in the last agreed-upon IEP of Spring 2019. (Ibid.; **Exhibit B**, p. 1 of attached "Final Decision on Emergent Relief")

7. On July 13, 2020, Cherry Hill Board Solicitor Robin Ballard wrote to petitioner suggesting that he withdraw his emergent relief motion, as the attached July 9, 2020 e-mail of Supervisor Trina Ragsdale corrected a prior miscommunication and demonstrated that the District intended to provide the continued speech services that the motion sought. Mr. Epstein did not withdraw the application for emergent relief and the matter was transmitted to the Honorable Jacob N. Gertsman, A.L.J. for an emergent hearing. (**Exhibit B**, pp. 2-3 of attached "Final Decision on Emergent Relief")

8. On July 16, 2020, the OAL issued a "Final Decision on Emergent Relief" compelling the District to provide the "stay put" services described in the prior IEP - which Ms.

       Ragsdale, on behalf of the District, had previously committed to providing. (**Exhibit B**, attached "Final Decision on Emergent Relief")

9. On August 11, 2020 the Office of Administrative Law issued a prehearing order defining the scope of the proceeding as follows:

   The hearing shall be limited to the issues raised in the pleadings. The due process petition raises the following issue: Petitioners obo student seek placement in an inclusion class with a 1:1 aide.

   (**Exhibit D**)

## The Amended Petition of July 9, 2020, Accepted as Filed on October 21, 2020

10. On July 21, 2020, Plaintiffs' counsel filed a motion to amend the original petition to conform with the petition he had attempted to file with the motion for emergent relief on July 9, 2020. A.L.J. Gertsman granted the motion verbally during telephonic oral argument on October 21, 2020. (**Exhibit A**, p. 3)

11. The Amended Petition sought the following relief:

    The parents request that the District provide services based on Brooke's stay-put 19-20 IEP, for both the ESY 2020 term, as well as the 2020-2021 term. The parents request the District provide make-up sessions for any services they failed to provide as required by the stay-put IEP. (Id.)

## Respondent's Motion to Dismiss for Mootness

12. Prior to the start of the school year, the Board accepted the petitioners' demand to place B.V. in a general education setting and expressed its willingness to change B.V.'s placement. Following a settlement conference on September 9, 2020, the District placed B.V. in a general education kindergarten class with a 1:1 aide, the precise relief that the initial petition had requested. While this rendered the petition moot, the petitioners did not withdraw it. Additionally, although both petitions were filed after

the District had closed its school buildings and began providing educational services remotely on account of mandatory COVID protocols, neither the original petition filed by the parents nor the amended petition filed by their attorney asserted that the District was not appropriately providing services to B.V. during the pandemic. (**Exhibit A**, pp. 2-4)

13. While petitioner F.V. subsequently would testify that it was unclear whether the paraprofessional present during remote learning was truly assigned to B.V. and/or providing services as a 1:1 aide, no evidence was presented to rebut the undisputed testimony of Supervisor of Special Services Trina Ragsdale that B.V. was placed in a general education kindergarten class with a 1:1 aide. (**Exhibit A**, pp. 7-10)

14. Unlike a subsequent petition filed by Mr. Epstein in January 2021 (assigned Agency Ref. No.2021-32438 and OAL Docket EDS 01556-2021 following its transmission to OAL, litigated to a conclusion, decided in favor of the District and recently appealed to this Court under Civil Action 22-4401), neither the original petition nor the amended petition in this case addressed the precise nature of support to be provided by the 1:1 aide or how such support could or should be provided during virtual learning necessitated by pandemic-related building closures. (**Exhibit A,** pp. 1, 3)

15. In November 2020, the District convened an IEP meeting and issued a final IEP formalizing the implementation of the general education kindergarten placement with a 1:1 aide as demanded in the original petition, as well as continuation of related services at the same duration and frequency as those contained in the prior IEP as demanded in the amended petition. (**Exhibit A**, pp. 7-8, Administrative Exhibits R-1, R-11)

16. Following the issuance of the new IEP memorializing the then-current placement, the Board filed a timely motion to dismiss the petition as moot. (**Exhibit A**, p .3)

17. Petitioners opposed the motion and submitted a cross-motion seeking to enforce what they contended was a binding settlement based on the terms of a proposed settlement placed on the record during a settlement conference of September 9, 2020. (**Exhibit A**, p. 4)

### **Denial of Motion to Enforce Settlement, Hearing of December 11, 2020**

18. On the first scheduled hearing date of December 11, 2020 the Court verbally denied Petitioners' motion to enforce the alleged settlement and indicated that it would defer ruling on the District's motion to dismiss because it wished to hear testimony. The Court then directed the parties to continue settlement negotiations, which were unsuccessful. Counsel made opening statements, and the Court adjourned the proceedings without taking testimony, subject to continuing the hearing on January 4, 2021 and February 8, 2021. (**Exhibit A**, p. 4) (Transcript from the December 11, 2020 hearing date, hereinafter "T1" at 8:3-27:7)

### **Hearing of January 4, 2021**

19. The first witness to testify on behalf of the Board of Education was Trina Ragsdale. (Transcript from the January 4, 2021 hearing date, hereinafter "T2," at 4:19-20)

20. Ms. Ragsdale testified that she is employed by the Board as a Supervisor of Special Education and oversees the delivery of special education programs within eight of the District's schools. (T2 at 7:5-16)

21. While Ms. Ragsdale oversees more than 3,000 students, she is personally familiar with B.V. and was aware that Petitioners had filed a petition for due process in late spring of 2020. (T2 at 8:1-16)

22. Ms. Ragsdale testified that after learning of the Petition, "I reviewed what the parents were asking for and at that time we wanted to be collaborative…we were in the midst of a pandemic and we knew that school was going to be remote, we thought it would be workable to provide what the parents were asking for, which was placement in a [general education] setting with an aide." (T2 at 105:10-17)

23. Prior to the filing of the petition, Ms. Ragsdale had learned that B.V. was a classified student attending the District's early childhood education center, where she had been placed in a self-contained setting. (T2 at 10:25-11:3)

24. Ms. Ragsdale explained that a "self-contained setting" is where a special education teacher provides the level of instruction required by the student, and the students within that classroom are all classified. (T2 at 11:6-9)

25. Ms. Ragsdale understood in May 2020 that Petitioners wanted B.V. to be placed in a general education setting. (T2 at 11:13-14)

26. Ms. Ragsdale identified the cover page of the IEP developed in the Spring of 2019 by the preschool child study team for B.V.'s 2019-2020 school year. (**R-1**) (T2 at 11:18-19)

27. This IEP proposed placement in a self-contained preschool half-day program for B.V. for the 2019-2020 school year and B.V. did attend this program for the 2019-2020 school year. (T2 at 11:23)

28. Ms. Ragsdale then identified the cover page of the IEP developed in March 2020 by the preschool child study team for B.V.'s 2020-2021 school year. (**R-2**) (T2 at 12:23-13:5)

29. Ms. Ragsdale explained that this IEP recommended placement in a "special class mild to moderate language and learning disabilities, which is a self-contained program." (T2 at 13:22-14)

30. Ms. Ragsdale reviewed the Petition and the attached recommendation from Dr. Pipan when the Petition was filed. (T2 at 13:20-24)

31. She also identified the email she sent to Petitioners clarifying a misunderstanding regarding B.V.'s services during the 2020 extended school year ("ESY"). (**R-3**) (T2 at 15:16-21)

32. Ms. Ragsdale sent this email because there had been some confusion as to the frequency and duration of B.V.'s services during ESY 2020, which arose "between the filing of the petition and the [Kindergarten] team receiving the IEPs." Ms. Ragsdale thus clarified B.V.'s "stay-put" program for ESY 2020. (T2 at 16:6-10)

### The District's Offer of Make-Up Speech Sessions

33. Ms. Ragsdale identified an email sent by Petitioner F.V. to B.V.'s speech therapist, on which Ms. Ragsdale was copied. (**R-4**) The speech therapist was attempting to schedule additional speech sessions for B.V. to compensate for two missed sessions in the Spring of 2020. (T2 at 17:13-20)

34. Ms. Ragsdale has not received any direct or indirect communication from Petitioners responding to the offer to schedule make-up sessions other than Petitioners' email correspondence with the speech therapist, wherein Petitioners advised the speech

therapist (**P-5**) that their attorney was handling the scheduling of make-up speech sessions. The email reflected Petitioners' response to a second attempt by B.V.'s speech therapist to schedule the first of the two make-up speech sessions. (T2 at 13:21-18:22)

35. Ms. Ragsdale testified that B.V. was ultimately placed in a general education setting with a 1:1 aide (**R-5**). (T2 at 18:24-19:3)

36. Ms. Ragsdale stated "my direction to the team, once we understood what Parents were seeking, and again, in an attempt to be collaborative with the family in wanting to resolve the matter, we agreed to place B.V. in a general education setting and the team at the elementary school was informed that she should be placed in a general education classroom with an aide." (T2 at 19:23-20:5)

37. B.V.'s placement was changed to the general education setting on September 10, 2020. Per B.V.'s attendance records, there were two school days in which B.V. remained in a self-contained placement prior to the change to the general education setting. (T2 at 20:6-21:11)

**The Drafting of an IEP Reflecting B.V.'s Placement in an Inclusion Class with a 1:1 Aide**

38. Ms. Ragsdale identified a "Request to Amend an IEP without a Meeting" form that she had sent to Petitioners. (**R-8**) Petitioners did not sign this form. Accordingly, in a further effort to draft a mutually agreeable IEP, counsel for the Board communicated with Petitioners' attorney to schedule an IEP meeting. (T2 at 28:9-29:2)

39. The parties ultimately convened an IEP meeting, which Ms. Ragsdale attended, along with members of the child study team and Board counsel; Petitioners were accompanied by Mr. Epstein. (T2 at 29:8-29:6)

40. At the meeting, the District staff attempted to obtain input from B.V.'s parents as to whether they were happy with B.V.'s program or if they wished to make changes. Specifically, the case manager asked the parents directly if they had any input. B.V.'s parents did not respond. (T2 at 31:11-15)

41. In response to a second attempt to elicit input from the parents, their attorney interjected and advised that the parents would not be speaking. (T2 at 31:20-21)

42. After the meeting B.V.'s case manager sent Petitioners an email attaching a copy of B.V.'s finalized IEP, Prior Written Notice a Consent to Implement IEP form, and attendance pages. (**R-11**) The finalized IEP described the program that B.V. had been receiving since September 10, 2020. The related services placed in this finalized IEP were of the same type, frequency and duration as the related services in B.V.'s IEP for the prior 2019-2020 school year; the only addition in the finalized IEP was the 1:1 aide requested in the original petition. (T2 at 31:22-32:17)

43. Ms. Ragsdale was surprised when during his opening statement to the Court on December 11, 2020, Mr. Epstein accused the District of violating B.V.'s stay-put rights by placing B.V. in the general education classroom. (T2 at 33:10-13)

44. This accusation was confusing because the last agreed-up IEP – B.V.'s IEP for the 2019-2020 school year – had placed B.V. in a self-contained setting, which was precisely what the Petitioners had filed for due process to prevent. In response, the District had changed B.V.'s placement to a general education setting to honor the parents' request. (T2 at 33:47-34:58) Had the District continued to implement the 2019-2020 IEP, Ms. Ragsdale explained, "B.V. would have been placed back in preschool, essentially, in a self-contained setting." (T2 at 32:16-34:16)

45. As such, following Petitioners' counsel's statement, Ms. Ragsdale contacted Petitioners via email to seek to understand whether they wanted B.V. to remain in her current program. They did not respond. (T2 at 34:17-23)

46. On cross-examination, Ms. Ragsdale identified a draft IEP that was shared with B.V.'s parents in March, as well as a later, finalized copy (**P-7**) (**P-8**). (T2 at 37:15-20)

47. When questioned as to the existence of experts' reports and whether a general education setting was considered as a placement for B.V., Ms. Ragsdale explained that the team relies on the reports completed by the child study team. (T2 at 43:25-44:5)

48. Ms. Ragsdale did not agree with Petitioners' assumption that the child study team's reports failed to address whether B.V. could be educated in a general education environment. Ms. Ragsdale explained that "as part of the assessment process, the team certainly takes that into consideration and it was the team's determination that at that time, a self-contained program was warranted." (T2 at 45:10-13)

49. Ms. Ragsdale also identified a copy of the April 24, 2020 correspondence from Mary Pipan, MD ("Dr. Pipan") which Petitioners had attached to their Petition.) Ms. Ragsdale testified that she recalled receiving this document from B.V.'s case manager, who had received it from Petitioners. (T2 at 48:2-13)

50. Ms. Ragsdale testified that the team reviewed and considered Dr. Pipan's report. An evaluation planning and/or other formal meeting was not held, however; "the team was only required to review and consider the report, which they did." (T2 at 48:22)

51. Ms. Ragsdale confirmed that B.V. presently was attending school via virtual learning and explained that the entire school district was operating remotely at the direction of the Camden County Department of Health. (T2 at 66:18-67:1)

52. Ms. Ragsdale testified that B.V. was assigned a 1:1 aide. Although she did not have documentation of the nature of the assistance provided to B.V. by the aide, that information would be reflected in B.V.'s progress reports. (T2 at 67:8-69:13)

**The Court Overrules the District's Objection to Questions Regarding the Mode and Manner of Assistance from B.V.'s 1:1 Aide During Virtual Instruction in the 2020-2021 School Year**

53. Over the District's objection the Court permitted cross-examination regarding the mode and manner of services delivered to B.V. in the virtual learning setting during a period of pandemic-related building closures, such as B.V.'s receipt of assistance from a 1:1 aide, and whether the virtual program provided B.V. with a free and appropriate public education. (T2 at 50:25-72:5)

54. Neither of these issues was raised in either the original Petition or the Amended Petition – both of which were filed amidst the pandemic and B.V.'s receipt of educational services remotely. At no time did Petitioners seek to amend either of those petitions to add such claims, to claim that B.V. was being denied a free, appropriate public education or to seek compensatory educational services beyond a few missed speech sessions in the Spring of 2020. (T2 at 68:5-6)

55. In response to the District's objection to questions about the 1:1 aide's involvement in B.V.'s remote learning, the Court ruled as follows:

> I am going to overrule that objection because I think that this is an important fact that needs to be established one way or the other, because at some point we're going to get to Petitioners' [sic] motion that this matter is moot, and I think the fact that whether or not B.V. is, in fact, receiving the assistance of a 1:1 aide, is important. (T2 at 68:16-24)

56. On re-direct, Ms. Ragsdale confirmed that B.V. is receiving the services of a 1:1 aide, and that documentation of the 1:1 aide's involvement is reflected within the IEP

|   |   |
|---|---|
|   | educational performance summary provided by B.V.'s Kindergarten teacher on or about November 17, 2020. (T2 at 90:19-91:18) |
| 57. | On Re-Cross, Ms. Ragsdale explained that this IEP is a proposed IEP which accurately reflects B.V.'s current program. Petitioners have not formally consented to the IEP and/or responded to the Board's request for consent – it simply memorializes what they demanded in the Petition and what B.V. is presently receiving. (T2 at 93:1-13, **R-11**; original Due Process Petition) |

### The Court's Verbal Denial of the District's Motion to Dismiss

58. Following Ms. Ragsdale's testimony the Court, which had previously indicated an intention to conduct oral argument on the motion to dismiss, decided to deny the motion. In disagreeing that the dispute was moot, the Court reasoned as follows:

> I'm going to deny [the District's motion to dismiss] for a number of reasons. One is I have concerns about the stay-put issue. If it was only the stay-put issue, I would have asked you to brief it and then come back and then made my ruling. I have not seen enough on–other than one paragraph in the proposed IEP–about the 1:1 aide to grant a motion for summary decision. That does not mean that the District won't prevail in the end, but obviously it's a different standard for the summary decision. So the District's motion is denied; we are going to continue with the hearing. (T2 at 95:3-18)

### Hearing of January 26, 2021

<u>The Court's Refusal to Preclude Dr. Pipan's Testimony and Admonition to Petitioners' Counsel that Dr. Pipan's Testimony Should be Confined to the Contents of Her Report</u>

59. At the close of the first day of testimony, counsel for the District suggested that the testimony of Dr. Pipan was unnecessary because the District did not dispute any of the opinions or recommendations in her report; in fact it had changed B.V.'s placement to satisfy the parents' demands based on Dr. Pipan's recommendations. The parties

subsequently briefed the issue, and the District, via letter brief dated January 25, 2021, argued:

> Neither of the petitions at play in this hearing asserts that remote learning has deprived B.V. of a free, appropriate public education. Neither petition seeks compensatory education. Dr. Pipan's June and August 2020 reports contain no opinion regarding the remote instruction provided to B.V. during the COVID-19 pandemic or how B.V.'s 1:1 aide should conduct him/herself when providing remote education to B.V. during virtual learning. As such, it would be violative of N.J.A.C. 1:6A-10.1(c); 20 U.S.C. §1415 (f); C.F.R. 300.512, an abuse of discretion and a denial of due process to the District to permit Dr. Pipan to testify regarding such issues, or any other issues not addressed in her reports of June and August 2020.
>
> As the opinions in those reports are not disputed for purposes of this litigation and B.V. has received the placement she has recommended, testimony from Dr. Pipan should be precluded altogether. (Lest Mr. Epstein claim that he would require admission into the evidentiary record of Dr. Pipan's reports for purposes of a complete record on appeal, we would have no objection to both of the reports, along with her CV, being entered into evidence.) (**Exhibit C**, pp. 11-12)

60. The Court entertained oral argument on this issue on January 26, 2021, and ruled that Dr. Pipan may testify. The Court did not respond to the substance of the District's evidentiary arguments. However, it concluded with a warning to Plaintiff's counsel that Dr. Pipan's testimony should be confined to the opinions expressed in her reports. (Transcript from January 26, 2021 hearing date, hereinafter "T3" at 6:22-7:7)

## Hearing of February 8, 2021

Mary Pipan, MD, Children's Hospital of Philadelphia

61. Dr. Mary Pipan identified her CV (**P-9**) and reviewed her educational and professional experience. (Transcript from February 8, 2021 hearing date hereinafter "T4" at 7:9-11:10)

62. Dr. Pipan was accepted as an expert witness in Developmental Pediatrics with an expertise in Down Syndrome or Trisomy-21. Notably, she was not accepted as an expert in special education. (T4 at 11:23-12:1)

63. Dr. Pipan testified that she sees children from infancy to adulthood with Trisomy-21 and monitors their developmental, behavior, educational, and mental health needs so that they may flourish and grow into adulthood as able as they can. (T4 at 12:22-13:4)

64. Dr. Pipan identified a letter she wrote on August 31, 2020 after an in-person appointment with B.V. on August 27, 2020. Dr. Pipan wrote the letter to advocate regarding B.V.'s needs within the educational system. (T4 at 12:12-15) (**P-13**)

65. She had an opportunity to meet with B.V. to observe her attentiveness, cooperation, compliance, and her speech. (T4 at 0:16:15)

66. She also reviewed observations conducted and prepared by the Cherry Hill Board of Education.  (T4 at 13:16-17:6)

67. She felt that B.V. would be a good candidate for the general education classroom with a 1:1 aide. (T4 at 17:14-18)

68. Dr. Pipan testified to the opinions expressed in her report. (T4 at 18:4-20:5) (**P-3**)

69. When Petitioners' counsel asked her questions designed to elicit testimony beyond the scope of her report – specifically, her opinion as to how a 1:1 aide should assist B.V. as opposed to whether B.V. should have a 1:1 aide - counsel for the District objected on the basis that such questions called for testimony outside the scope of her reports. (T4 at 20:6-27:25)

70. Notwithstanding the Court's prior statement on January 26th that Dr. Pipan would not be permitted to testify regarding matters beyond the scope of her reports, the Court

      overruled the objection on the basis that previously the Court had expressed interest in hearing testimony regarding the 1:1 aide's provision of support during the current school year. (T4 at 28:1-14)

71. With regard to the issue of a 1:1 aide, Dr. Pipan testified that in a live setting, an aide should be within close proximity of B.V. so that he can intervene if needed. (T4 at 40:3-10)

72. She further testified that she that recommended that B.V.'s multiple therapies continue and that the 1:1 aide be present. (T4 at 40:12-19)

### Petitioner F.V.

73. Petitioner F.V. provided information about his family and explained that B.V. has a male twin who is not classified to receive special education and attends kindergarten in a general education classroom. F.V. reviewed B.V.'s care after her birth, and explained that she received services through New Jersey's early intervention program. F.V. also discussed B.V.'s placement history in the District's preschool program during the 2017-2018 and 2018-2019 school years. (T4 at 46:18-50:20)

74. F.V. recalled attending B.V.'s Annual Review IEP meeting at the end of the 2018-2019 school year and identified the IEP proposed for B.V. for the 2019-2020 school year. (**P-1**) (T4 at 52:19)

75. The IEP team discussed B.V.'s exposure to general education peers through a "reverse inclusion" model, wherein students from other classrooms would join the self-contained classroom. However, the District's suggestion to introduce B.V. to general education peers via a reverse inclusion model was not included in the IEP. (T4 at 51:22-52:8)

76. F.V. testified that B.V. attended the District's 2019 extended school year program, which provided programming three hours a day, four days a week, for four weeks. (T4 at 52:17-18)

77. For the 2019-2020 school year, B.V. again attended the half-day self-contained preschool program. (T4 at 53:2-4)

78. When asked about the reverse inclusion model discussed at B.V.'s Annual Review meeting, F.V. testified that he "was not familiar with the frequency at which reverse inclusion took place," but that it was his understanding that the reverse inclusion did occur. (T4 at 57:10-11)

79. The District did not describe the frequency and duration or provide any formal reports regarding B.V.'s performance during reverse inclusion. (T4 at 57:18-25)

80. F.V. testified that on the first day of school of the 2019-2020 school year, Petitioners reached out to B.V.'s case manager to discuss B.V.'s exposure to non-disabled peers. F.V. recalled that they wanted to remind the case manager that B.V. was in her third year of preschool and that "she had met or exceeded all of her goals up until that time and she was doing very well in school." (T4 at 58:14-59:18)

81. F.V. identified B.V.'s speech and language evaluation (**P-2**), psychological evaluation (**P-3**), and the educational evaluation (**P-4**) conducted as part of her evaluation during the 2019-2020 school year (T4 at 62:5-63:8)

82. F.V. identified B.V.'s report card (**P-5**) (T4 at 01:35:25) F.V. identified B.V.'s draft IEP for the 2020-2021 school year (**P-7**) as well as the IEP provided after the IEP meeting for the 2020-2021 IEP (**P-8**) F.V. testified that the District scheduled another

|     |     |
| --- | --- |
|     | meeting to discuss Petitioners' request for a general education placement for B.V. (T4 at 63:10-64:22) |
| 83. | F.V. did recall attaching Dr. Pipan's letter to the due process petition. He and his wife "focused more on [B.V.'s] performance at school" at the second meeting and he could not recall if Dr. Pipan's May 2020 correspondence was discussed. (T4 at 76:24-77:12) |
| 84. | Regarding the frequency and duration of services in September 2020, F.V. testified that B.V has class videos that were about five to seven minutes long on a daily basis and one weekly class meeting that might have been about 15 to 25 minutes. (T4 at 77:19-22) |
| 85. | F.V. testified that he was the only person providing B.V. daily support for her education at home and no one from the school was privately there. (T4 at 94:6-13) |
| 86. | F.V. testified that the aide was not present for occupational therapies, speech group therapy group sessions, and physical therapies. (T4 at 110:25-111:17) |
| 87. | Petitioners' counsel asked F.V. what he has to do "because the aide was not present" and F.V. responded that it was "similar to what we did in ESY" in setting up the space and ensuring that B.V. has the materials necessary for the lesson. (T4 at 111:18-24) |
| 88. | F.V. did not receive any training or receive supervision from the school on how to provide assistance to B.V. (112:7-14) |
| 89. | On cross-examination, F.V. testified that there was an understanding that B.V. would periodically go into the general education classroom. (T4 at 128:11-15) |
| 90. | F.V. admitted that there was an observation of B.V. in a general education setting. In addition to the reverse inclusion, B.V. was in Tracy Maides' general education class beginning in the Fall of 2019. (T4 at 128:11-25) |

91. F.V. admitted that there were discussions of B.V. entering the general education classroom but no additional discussions of how she was doing in the classroom. (T4 at 129:7-131:20)

92. During cross examination, when reviewing **Exhibit R-3** – the e-mail offering makeup speech therapy – F.V. testified that B.V. missed two speech sessions. (T4 at 132:2-11)

93. Addressing his email at **Exhibit R-4**, F.V. testified that he did not cooperate with District staff to re-schedule the make-up speech sessions because he retained an attorney. (T4 at 134:9-19)

94. F.V. stated that the program that B.V. presently receives is not satisfactory to him and his wife because she is not receiving what F.V. considers to be adequate 1:1 support. (T4 at 151:19-20)

95. He admitted that of the 15-17 children in B.V.'s classroom, several have parents assisting them during remote instruction. (T4 at 154:3)

96. F.V. testified that he would like B.V. to continue her therapy sessions with Ms. Wallace to communicate the results of B.'s therapy sessions with the teacher so that her daily school program and lesson plans may be accommodated. (T4 at 154:19-25)

## ALJ GERTSMAN'S FINAL DECISION OF JUNE 17, 2021 AND THIS APPEAL

97. On June 17, 2021, ALJ Gertsman issued a Final Decision agreeing with the District that it had "provided petitioners with the relief sought in both the petition and the amended petition," and dismissing the petition because "a controversy no longer exists, meaning this case has become moot." (**Exhibit A**, p. 17)

98. Plaintiffs thereafter filed a Verified Complaint in New Jersey Superior Court on September 15, 2021 and a First Amended Verified Complaint in New Jersey Superior

Court on September 24, 2021 appealing from ALJ Gertsman's decision pursuant to the IDEA (Count One) and seeking relief under the NJLAD (Count Two). (Document 1-1, 1-2)

99. While paragraph 15 of the First Amended Verified Complaint seeks reversal of ALJ Gertsman's Final Decision of June 17, 2021, paragraph 14 asserts that "the Vs are prevailing parties on the 7/16/20 Final Order" and the paragraph concluding Count One seeks a consequent award of counsel fees and costs. (**Exhibit B**, pp. 2-3)

100. The District removed the case to United States District Court on October 5, 2021 (Document 1) and filed an Answer on October 11, 2021. (Document 2)

101. On November 24, 2021 the District filed a motion to dismiss Count Two for failure to state a claim. (Document 9)

102. Following oral argument in May 2022, this Court granted that motion on June 16, 2022 (Document 23), leaving only Count One – plaintiffs' IDEA appeal.

103. The parties have agreed that discovery is unnecessary and that the IDEA appeal should be addressed via dispositive motion practice based solely on the administrative record. (Joint Discovery Plan and Rider, Documents 12 and 13)

104. The New Jersey Department of Education has forwarded the administrative record to the Court. (Document 15)

105. The District now moves for summary judgment on plaintiffs' sole remaining claim at Count One of the "First Amended Verified Complaint."

By:_____
Eric L. Harrison

DATED: July 18, 2022