UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| F.V. and M.V., individually and on behalf of B.V., <br><br>                 Plaintiffs, <br><br>                 v. <br><br> CHERRY HILL TOWNSHIP BOARD OF EDUCATION, <br><br>                 Defendant. | Civil Action <br><br> No. 1:21-CV-18096-KMW-SAK <br><br><br> **OPINION** |

Jamie M. Epstein, Esquire
17 Fleetwood Drive
Hamilton, NJ 08690

      *Counsel for Plaintiffs F.V. and M.V., individually and on behalf of B.V.*

Eric L. Harrison, Esquire
Methfessel & Werbel
2025 Lincoln Highway, Suite 200
Edison, N.J. 08818-3012

      *Counsel for Defendant Cherry Hill Township Board of Education*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Plaintiffs F.V. and M.V., on behalf of their minor daughter, B.V., bring this action against Defendant Cherry Hill Township Board of Education (the "Board") under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400, *et seq.* Specifically, Plaintiffs appeal the June 17, 2021 Final Decision of New Jersey Administrative Law Judge Jacob S. Gertsman (the "ALJ"), which denied Plaintiffs' claims and demands for relief as moot.

Presently before the Court is the Board's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56; Plaintiffs have not opposed the Board's Motion.[1] For the reasons set forth below, the Board's Motion is granted, and the ALJ's Final Decision is affirmed.

## II.   BACKGROUND

### A.  Statutory Framework

The IDEA is a "comprehensive scheme of federal legislation designed to meet the special educational needs of children with disabilities." *M.A. ex rel E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335, 338 (3d Cir. 2003). In exchange for federal funding, states pledge to comply with a number of substantive and procedural conditions in providing educational services to qualifying disabled students. *See T.R. v. Sch. Dist. of Philadelphia*, 4 F.4th 179, 182–83 (3d Cir. 2021). In turn, state recipients then apportion federal funds to Local Educational Agencies ("LEAs"), like the Board here, who are in turn responsible for providing educational services under the IDEA. *See* 20 U.S.C. §§ 1401(19), 1412–1414.

#### i.  *Free Appropriate Public Education ("FAPE")*

One of the essential concepts of the IDEA is its mandate that qualifying students be provided with a "free appropriate public education" ("FAPE"). *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citing 20 U.S.C. § 1412(a)(1)). Though the IDEA does not specifically prescribe what a FAPE entails, it does make clear that it consists of both "special education" and "related services." *See Bd. Of Educ. Of Henrick Hudson Cent. Sch.*

---

[1] Notwithstanding Plaintiffs' failure to oppose the Board's Motion, the Court nevertheless considers "whether the motion for summary judgment has been properly made and supported and whether granting summary judgment is appropriate." *Rahman v. Taylor*, No. 10-0367, 2013 WL 1192352, at *3 (D.N.J. Mar. 21, 2013). However, because Plaintiffs have not responded to the Board's Statement of Material Facts, the Court will deem them undisputed. *See* L. Civ. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").

*Dist., Westchester Cnty. V. Rowley*, 458 U.S. 176, 188–89 (1982) (citing 20 U.S.C. §§ 1401(26), (29)). The IDEA also contains a "mainstreaming" component, reflecting a strong preference for a qualifying children to be educated in the "least restrictive environment." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006). To this end, the "least restrictive environment" entails one that, "to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 265 (3d Cir. 2003) (citing 20 U.S.C. § 1412(a)(5)(A)) (internal quotation marks omitted); *see also Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1213–14 (3d Cir. 1993) ("[T]his provision sets forth a 'strong congressional preference' for integrating children with disabilities in regular classrooms.").[2]

### ii.  *Individualized Education Program ("IEP")*

The so-called "centerpiece" of the IDEA is the "individualized education program" ("IEP"), which serves as the "primary vehicle" by which states provide students with a FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1412(a)(4). "An IEP is a written statement, 'developed, reviewed, and revised' by [an] 'IEP Team'—a group of school officials and the parents of the student—that spells out how a school will meet an individual disabled student's educational needs." *Y.B. ex rel. S.B. v. Howell Twp. Bd. of Educ.*, 4 F.4th 196, 198 (3d Cir. 2021) (quoting 20 U.S.C. §§ 1414(d)(1)(A), (B)). In addition, an IEP sets forth the student's "present levels of academic achievement, offers measurable annual goals to enable the child to . .

---

[2] The IDEA describes the "least restrictive environment" as follows: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

. make progress in the general educational curriculum, and describes supplementary aids and services . . . provided to the child to meet those goals." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (II)(aa), (IV)) (internal quotation marks omitted) (omissions in original).

### iii.  *IDEA Violations*

Generally speaking, there are two species of IDEA violations. First, there is a "substantive violation," which arises when an "IEP's content, such as the educational services, is insufficient to afford the student a FAPE." *S.W. v. Elizabeth Bd. of Educ.*, No. 22-11510, 2022 WL 807344, at *6 (D.N.J. Mar. 17, 2022). In contrast, a "procedural violation" occurs "when the school district fails to comply with the processes required by the IDEA." *Id.*; *see also ASAH v. New Jersey Dep't of Educ.*, No. 16-3935, 2017 WL 2829648, at *10 n.10 (D.N.J. June 30, 2017) ("A procedural violation generally concerns the process by which the IEP and placement offer was developed and conveyed; on the other hand, a substantive violation arises from a deficiency in the programming being offered." (internal quotation marks omitted)).

The potential relief that may be afforded to parents depends on the specific violation they allege has occurred. Parents who allege a substantive violation—such as a denial of a FAPE—may seek compensatory relief in the form of appropriate educational services within the district ("compensatory education") or tuition reimbursement for an appropriate placement in private school. *See C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010). "On the other hand, a plaintiff alleging only that a school district has failed to comply with a procedural requirement of the IDEA, independent of any resulting deprivation of a FAPE, may only seek injunctive relief for prospective compliance." *Id.*

#### iv. *Dispute Resolution Procedures*

Where a dispute arises concerning a qualifying child's education and services, parents may pursue a number of dispute-resolution procedures, among which include the right to begin an "impartial due process hearing" in accordance with state law. *See* 20 U.S.C. § 1415(f)(1)(A). In New Jersey, this process entails filing a complaint and request for a due process hearing with the New Jersey Department of Education. *See A.C. o/b/o Z.P. v. W. Windsor-Plainsboro Bd. of Educ.*, No. 21-13016, 2022 WL 17340687, at *2 (D.N.J. Nov. 30, 2022); *see also* N.J. ADMIN. CODE § 6A:14-2.7(c). This process "encourages parents and the local school district to work together to formulate an individualized plan for a child's education, and allows the education agencies to apply their expertise and correct their own mistakes." *Woodruff v. Hamilton Twp. Pub. Sch.*, 305 F. App'x 833, 837 (3d Cir. 2009). However, if a resolution cannot be reached, the matter is transmitted to the New Jersey Office of Administrative Law (the "NJOAL") to be adjudicated by way of a "due process hearing." *See Est. of S.B. by & through Bacon v. Trenton Bd. of Educ.*, No. 17-07158, 2018 WL 3158820, at *2 (D.N.J. June 28, 2018); *see also* N.J. ADMIN. CODE § 6A:14–2.7.

"The decision of the administrative law judge is final, binding on both parties, and to be implemented without undue delay unless stayed . . ." N.J. ADMIN. CODE § 6A:14-2.7(l). If parents are dissatisfied with the outcome of the due process hearings, they may seek judicial review of an ALJ's decision "by filing an action in a competent state or federal court" *Y.B.*, 4 F.4th at 198 (3d Cir. 2021) (citing 20 U.S.C. § 1415(i)(2)).

#### B. Factual Background and Procedural History

Plaintiffs are the parents of B.V., a minor child currently enrolled as a student in the Cherry Hill School District. (ECF No. 11-7 at 197). B.V., who has Down syndrome, has been identified

and deemed eligible for special education and related services pursuant to the IDEA. (*Id.*).[3] During the 2019–2020 school year, B.V. attended a "self-contained" pre-school program—an educational setting that only educates children with special needs. (*Id.* at 198). In addition, B.V. also received certain supplementary services, which included individual speech therapy sessions. (ECF No. 11-1 at 14). B.V.'s placement and services were prescribed by her 2019–2020 IEP, which had been developed by the Board and approved by B.V.'s parents (the "Pre-School IEP"). (*Id.*).

However, a dispute ultimately arose between Plaintiffs and the Board as to B.V.'s recommended placement for the subsequent 2020–2021 school year.  On March 30, 2020, the Parties convened a meeting in which they sought to review and, if necessary, redevelop B.V.'s IEP in anticipation of her kindergarten year. As with the Pre-School IEP, the final version of the 2021–2021 IEP proposed to B.V.'s parents (the "Kindergarten IEP") recommended that B.V. continue her placement in a self-contained classroom during her kindergarten year. (ECF No. 11-1 at 15). Plaintiffs, however, rejected the Board's proposal, wishing instead for B.V. to be placed in an "inclusion" or "general education" setting—one in which special-needs children are educated alongside non-disabled children. *See* Def.'s SMF ¶ 4.

### i. *Plaintiffs' First Petition*

On May 9, 2020, Plaintiffs filed a Request for Mediation with the New Jersey Department of Education (the "NJDOE"), in which they formally rejected the Board's the Kindergarten IEP's proposed placement. (ECF No. 11-1 at 32–39). More specifically, Plaintiffs asserted that B.V.'s placement in a self-contained setting was not the "least restrictive environment" the IDEA demands. (*Id.*). Wishing for B.V. to be exposed to other, non-disabled children, Plaintiffs

---

[3] For purposes of this Motion, the Court recites only the facts it deems relevant to the Parties' dispute, and which could be drawn from the ALJ's Final Decision (ECF No. 11-7 at 193–211), the administrative record (ECF No. 11), and the Board's Statement of Material Facts ("Def.'s SMF") (ECF No. 29-4).

demanded that B.V. be placed in an inclusion classroom, and that she be paired with an aide who specifically assists her during classroom instruction (the "1:1 aide"). (*Id.*).

Though the Parties thereafter participated in at least one mediation session, they were ultimately unable to resolve their dispute. *See* Def.'s SMF ¶ 5. As a result, on June 9, 2020, Plaintiffs converted their Request for Mediation into a Request for Due Process (the "First Petition"), which was subsequently transmitted to the NJOAL for adjudication. (ECF No. 11-1 at 1).[4]

### ii.  *Plaintiffs' Second Petition and Emergent Relief Petition*

By formally initiating due process proceedings, Plaintiffs' First Petition triggered the IDEA's "stay-put" provision, which mandates that a child who is subject to due process proceedings are to "remain in [her] then-current education placement . . . until all such proceedings have been completed." 20 U.S.C. § 1415(j). For B.V., the IDEA thus required that the Pre-School IEP be kept in place pending the resolution of the Parties' disagreement and entitled B.V. to continue receiving the same services she had received the year prior.[5]

As the extended school year was set to begin on July 6, 2020, Plaintiffs emailed a Board case manager on June 30, 2020, in which they sought confirmation that B.V. would, pending the Parties' dispute, continue to receive services based on her Pre-School IEP. (ECF No. 11-1 at 11).

---

[4] By correspondence dated July 2, 2020, the NJDOE informed Plaintiffs that their First Petition bearing Agency Reference No. 2020-31711 had been transmitted to the NJOAL for further proceedings. (ECF No. 11-1 at 117). The NJDOE further acknowledged that Plaintiffs were seeking B.V.'s "placement in an inclusion class with a 1:1 aide." (*Id.*).

[5] It has been observed that the IDEA's "stay-put provision functions as an automatic preliminary injunction which dispenses with the need for the Court to weigh such factors as irreparable harm and likelihood of success on the merits and removes the Court's discretion regarding whether an injunction should be ordered." *L.Y. ex rel. J.Y. v. Bayonne Bd. of Educ.*, No. 09-4422 SRC, 2009 WL 2998153, at *3 (D.N.J. Sept. 15, 2009), *aff'd*, 384 F. App'x 58 (3d Cir. 2010).

The case manager confirmed that B.V.'s services would reflect what was written in the Pre-School IEP. (*Id.* at 12). However, in reciting the several services prescribed to B.V. in her confirmation, it appears that the case manager had neglected to include B.V.'s speech therapy session. (*Id.*).

In response to what appears to be all but a simple misunderstanding, Plaintiffs filed a second Request for Due Process on July 9, 2020 (the "Second Petition"), in which they alleged that the Board was violating B.V.'s "stay-put" rights under the IDEA by failing to continue her educational services pursuant to her 2019–2020 IEP. (*Id.* at 17–24). Accompanying Plaintiffs' Second Petition was also a Request for Emergent Relief (the "Emergent Relief Petition"), demanding an order compelling the Board to "provide services based on [B.V.'s] stay-put 19-20 IEP, for both ESY 2020 term, as well as the 2020-2021 term . . . [and] provide make-up sessions for any services they failed to provide as required by the stay-put IEP." (*Id.* at 16).

This same day, Board supervisor Trina Ragsdale emailed Plaintiffs to correct the prior miscommunication. In her email, Ms. Ragsdale confirmed that the Board was committed to providing B.V. with speech therapy pursuant to her Pre-School IEP, and further indicated that it was also willing to make up two speech therapy sessions that B.V. had previously missed. (*Id.* at 57). Plaintiffs, however, did not withdraw their Emergent Relief Petition, and the matter proceeded before the ALJ for expedited adjudication.[6]

---

[6] Separately, the Court notes that on July 13, 2020, counsel for the Board, Robin Ballard, wrote to Plaintiffs' counsel, Jamie Epstein, explaining that the case manager's prior email to Plaintiffs was a miscommunication and suggested that the Emergent Relief Petition be withdrawn. In addition to attaching a copy of Ms. Ragsdale's email, Ms. Ballard confirmed that the Board was "aware that the 2019–2020 IEP is stay-put for B.V. while the dispute is pending." (ECF No. 11-1 at 59). Ms. Ballard echoed Ms. Ragsdale that the Board was committed to maintaining B.V.'s services, and that it would further provide make-up speech therapy sessions. Mr. Epstein, however, rebuffed Ms. Ballard in a manner strongly suggesting that his refusal to withdraw the Emergent Relief Petition was motivated by nothing more than a desire to secure legal fees for himself. (*Id.* at 63) (indicating that Plaintiffs would withdraw the Emergent Relief Petition only if the Board agreed to enter into a settlement so that their respective clients "may save $1,000s on [her] fees and [his] fees").

On July 15, 2020, the ALJ held oral argument on Plaintiffs' Emergent Relief Petition. During the hearing, the Board did not dispute that B.V. should continue to receive speech therapy pursuant to her Pre-School IEP. Indeed, the Board informed the ALJ that it had already committed to continuing B.V.'s Pre-School IEP services, as well as to providing two individual speech session that B.V. had previously missed. (ECF No. 11-8 at 9–12).[7] Plaintiffs appear to have all but conceded as much during the hearing by confirming that the Board had indeed already provided B.V. with one of the make-up speech therapy sessions that very week. (*Id.* at 28–29). However, because neither Party could confirm during the hearing whether the second make-up session had been scheduled, the ALJ decided to grant Plaintiffs Emergent Relief Petition, noting as follows:

> In the instant matter, it is not in dispute that respondent must provide services to B.V. based upon the 2019-2020 IEP. Notwithstanding this agreement, the parties have failed to resolve this matter, which undoubtedly could have been effectuated through greater communication, or by the scheduling of the required speech services by CHBOE. Unfortunately, neither has occurred. Therefore, as the record does not reflect whether the speech services have in fact been provided to B.V. for the ESY period that commenced on July 6, 2020, I CONCLUDE that CHBOE has not provided the services to B.V. as specified in the stay-put 2019-2020 IEP. I further CONCLUDE that the 2019-2020 IEP shall remain as stay-put during the pendency of this proceeding.

(ECF No. 11-1 at 102). As the ALJ had dispensed with Plaintiffs' Emergency Relief Petitions, the only matters pending for adjudication were those set forth in the First and Second Petitions.

---

[7] During oral argument, Ms. Ballard stated, "Your Honor, I find it very difficult to believe that we actually are here. There's absolutely no need for this application to have been filed at all and there certainly is no need for this argument as the parents have been given what they asked for through the emergent relief request." (ECF No. 11-8 at 9).

### iii.   *Consolidation of First and Second Petitions*

Though it is not entirely clear from the record, it appears that when Plaintiffs filed their Second Petition, the NJDOE did not accept it because the First Petition was already pending. Following the ALJ's Final Decision on their Emergent Relief Petition on July 16, 2020, Plaintiffs' counsel submitted a motion seeking leave to have the Second Petition "incorporated into" the First Petition. (ECF No. 11-1 at 156). The ALJ granted Plaintiffs' Motion on the record on October 21, 2020, and the First and Second Petitions, were effectively consolidated and treated as simultaneously operative for the remainder of the proceedings. (ECF No. 11-8 at 17–18).

By consolidating their First and Second Petitions, the scope of the proceedings were defined by the specific claims and demands for relief raised in both, namely:

1) That B.V. be placed "in an inclusion class with a 1:1 aide," (ECF No. 11-1 at 27, 29, 32–39, 168)[8]; and

2) That the Board "provide services based on [B.V.'s] 19-20 stay-put IEP, for both the [extended school year] 2020 term, as well as the 2020–2021 term until a resolution is reached via due process" (ECF No. 11-1 at 14, 23); and

3) That the Board "provide make-up sessions for any services [it] failed to provide as required by the stay-put IEP" (*Id.*).

### iv.   *The ALJ's Final Decision and Plaintiffs' Appeal*

The ALJ issued a Final Decision on June 17, 2021, in which he denied Plaintiffs' First and Second Petitions as moot. Evidently, prior to the start of B.V.'s kindergarten year in September

---

[8] On August 11, 2020, the NJOAL issued a Prehearing Order defining the scope of the First Petition as follows: "The hearing shall be limited to the issues raised in the pleadings. The due process petition raises the following issue: Petitioners obo student seek placement in an inclusion class with a 1:1 aide." (ECF No. 11-1 at 168).

2020, the Board had voluntarily agreed to provide B.V. with all of the relief Plaintiffs demanded in both of their Petitions. (ECF No. 11-1 at 204). Indeed, B.V. had apparently been in a general education setting with a 1:1 aide since September 10, 2020. (*Id.*). Concerning B.V.'s services, the ALJ found that the Board was in fact providing B.V. with the very same services that had been delineated in her Pre-School IEP, with the only addition being the 1:1 aide. (*Id.*). Concerning Plaintiffs' demand for makeup speech therapy sessions, the ALJ found that the Board had indeed attempted to schedule those sessions, but that Plaintiffs had apparently refused to cooperate. (*Id.* at 208). Based on these findings, the ALJ found that Plaintiffs had indeed been provided with all of the relief that they demanded, which thus rendered their First and Second Petitions moot.

Plaintiffs subsequently appealed the ALJ's Final Decision by filing a Verified Complaint in New Jersey state court. Thereafter, Plaintiffs amended their Complaint by filing a First Amended Verified Complaint (the "Amended Complaint"), which the Board subsequently removed to this Court on October 1, 2021. (ECF No. 1). The Amended Complaint originally set forth two counts: Count I appealed the ALJ's Final Decision under the IDEA, and Count II asserted claims for retaliation and discrimination under the New Jersey Law Against Discrimination (the "NJLAD"). *See* Am. Compl. ¶¶ 13–23. However, on motion of the Board, the Court dismissed Count II, without prejudice, for failure to state a claim. (ECF No. 23).[9]

In the instant Motion, the Board seeks summary judgment as to Count I and asks the Court to uphold the ALJ's Final Decision. The Parties have neither sought nor offered additional evidence, and have agreed to rely solely on the administrative record. Thus, the Board's Motion is ripe for adjudication. *See F.H. v. W. Morris Reg'l High Sch. Bd. of Educ.*, No. 19-14465, 2020 WL 7223600, at *4 (D.N.J. Dec. 8, 2020) ("On a motion for summary judgment, when no new evidence

---

[9] There too, Plaintiffs failed to oppose the Board's Motion to Dismiss.

is presented to the district court, the motion becomes the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." (internal quotation marks omitted)).

### III.   STANDARD OF REVIEW

The standard of review under which the Court considers an appeal of a state administrative decision under the IDEA "differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Tp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 Fed. App'x. 404 (3d Cir. 2003) (internal citations and quotations omitted). In reviewing an administrative decision, a district court is tasked with applying a "modified *de novo* review," which requires it to give "due weight" and "deference" to the findings in the administrative proceedings. *E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68, 71 (3d Cir. 2018). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (internal quotation marks omitted). "Nonetheless, the district court's review over questions of law and the ALJ's application of legal precepts is plenary." *M.A. v. Wall Twp. Bd. of Educ.*, No. 20-05218, 2021 WL 5448911, at *4 (D.N.J. Nov. 22, 2021) (citing *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 528 n.3 (3d Cir. 1995)).

### IV.   DISCUSSION

The basis for Plaintiffs' appeal remains unclear. The Amended Complaint vaguely asserts in a generalized fashion that Plaintiffs are "aggrieved" by the ALJ's Final Decision, and simply demand its reversal. Am. Compl. ¶ 15. What is more, Plaintiffs' failure to oppose the instant Motion has deprived the Court of any remotely meaningful understanding of what portions of the ALJ's Final Decision Plaintiffs specifically find objectionable. The task of comprehending

Plaintiffs' appeal is made all the more puzzling by an administrative record that does not readily expose any factual or legal errors in the ALJ's Final Decision.

Notwithstanding Plaintiffs' apparent abandonment of their appeal, they nevertheless bear the burden of persuasion as the parties challenging the ALJ's Final Decision. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012). "In addition to bearing the burden of persuasion," Plaintiffs also face "the additional hurdle of overcoming a presumption that the [ALJ's] findings were correct." *Andrew M. v. Delaware Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 345 (3d Cir. 2007). But because Plaintiffs have not even attempted to meet this burden, the Court will accept the ALJ's factual findings as correct and recite them herein.

### A.  Findings of Fact

The ALJ found that, prior to the start of B.V.'s kindergarten year, the Board had voluntarily agreed to provide B.V. with all of the services and accommodations Plaintiffs had demanded in both their First and Second Petitions. Following a settlement conference on September 9, 2022, the Board placed B.V. in a general education kindergarten class with a 1:1 aide—the very relief that Plaintiffs' First Petition demanded.[10] B.V.'s first day in this setting was September 10, 2020. When Ms. Ragsdale was questioned as to why the 1:1 aide was added, she responded, "[b]ecause that's what the parents requested, that's what they asked for."[11]

---

[10] During an evidentiary hearing before the ALJ, Ms. Ragsdale testified: "[M]y direction to the team, once we understood what Parents were seeking, and again, in an attempt to be collaborative with the family in wanting to resolve the matter, we agreed to place B.V. in a general education setting and the team at the elementary school was informed that she should be placed in a general education classroom with an aide." (ECF No. 11-7 at 199).

[11] Curiously, Ms. Ragsdale also testified that the Board had from the very outset intended to be collaborative, and indeed thought that the Board would be in a position to accommodate what the Plaintiffs had been demanding. (*Id.* at 198).

Thereafter, the Board convened a meeting with Plaintiffs and their counsel to draft a new IEP that reflected B.V.'s placement in an inclusion classroom with a 1:1 aide. Plaintiffs—apparently at their counsel's instruction—were uncooperative and refused to speak during the meeting. *See* Def.'s SMF ¶¶ 40–41. After the meeting, the Board sent Plaintiffs a revised IEP, which reflected the programing B.V. had been receiving September 10, 2020 (the "Finalized Kindergarten IEP"). *See id.* ¶ 42. Importantly, the services described in the Finalized Kindergarten IEP were of the same type, frequency, and duration as those prescribed in her Pre-School IEP, with the only addition being the 1:1 aide.[12]

During the evidentiary hearings before the ALJ, Plaintiffs apparently did not dispute that B.V. had indeed been placed in a general education setting as requested. Plaintiffs did, however, appear to claim that the Board had failed to provide B.V. with a 1:1 aide. Though, B.V.'s father later testified that "[t]here was a classroom aide," but that "nobody [had] made [Plaintiffs] aware that there was a [1:1] aide specifically assigned to work with [B.V.]." (*Id.* at 202). The ALJ determined, however, that F.V.'s testimony was "not believable" because it was "inconsistent with the documentary evidence in the record, along with Ragsdale's credible testimony." (*Id.* at 204).

However, at some point during the proceedings, it appears that Plaintiffs attempted to introduce new challenges and claims that had never been raised in either their First or Second Petitions. More specifically, Plaintiffs now asserted that B.V.'s assistance from the 1:1 aide and the virtual program being provided to B.V. were inadequate, and that the Board, as a result, had committed a separate violation of the IDEA for failing to provide a FAPE.[13] However, the ALJ

---

[12] Despite Plaintiffs having apparently received every form of relief they had demanded, Plaintiffs' counsel attempted to argue to the ALJ that the Board—by placing B.V. in a general education setting, as Plaintiffs requested—had actually violated B.V.'s stay-put rights. *See, e.g.*, Def.'s SMF ¶ 43.

[13] For example, during their cross-examination of Ms. Ragsdale, Plaintiffs attempted to question her concerning the "mode and manner of services delivered to B.V. in the virtual learning setting during a period of pandemic-related

rejected these newly asserted claims because they were beyond the scope of the First and Second Petitions. (*Id.* at 207).

Concerning Plaintiffs' demand for makeup speech sessions under the Second Petition, the ALJ found that the Board "remain[ed] willing to schedule the make-up speech session," but that Plaintiffs had "refused to accept the offer, instead referring the matter to counsel." (*Id.* at 208). Evidently, on July 8, 2020, Ms. Ragsdale sent an email to Plaintiffs indicating that the Board was "willing to make up the two individual speech lessons that were missed." *See* Def.'s SMF ¶¶ 31–32. Plaintiffs never responded. Thereafter, on July 22, 2020, Plaintiffs emailed B.V.'s speech therapist stating that their counsel, Jamie Epstein, would be handling the scheduling of additional speech sessions to compensate for the two she had missed. *See id.* ¶ 33. On October 5, 2020, Plaintiffs sent another email to B.V.'s counselor, in which they reiterated that Mr. Epstein would be rescheduling B.V.'s make-up speech sessions. *See id.* ¶ 34. Mr. Epstein, however, never attempted to schedule these sessions. The ALJ thus concluded:

> [I]t is inexplicable that this issue, which the [Board] sought to rectify on July 9, 2020, and was addressed in my order granting the motion for emergent relief on July 16, 2020, some eleven months ago, remains unresolved. [The Board] remains willing to schedule the make-up speech sessions, and the [Plaintiffs] have refused to accept the offer, instead referring the matter to counsel. While [Plaintiffs] are well within their rights to communicate with the [Board] through counsel, their failure to accept the offer to schedule the make-up sessions, and to then argue to this tribunal that they are entitled to the awarding of these same sessions as compensatory education, turns logic on its head. Put simply, in order to receive the make-up speech sessions for B.V., all the [Plaintiffs] have to do is accept [the Board's] offer. I CONCLUDE that their failure to do so does not render this a live controversy.

(ECF No. 11-7 at 208–09).

---

building closures, such as B.V.'s receipt of assistance from a 1:1 aide, and whether the virtual program provided B.V. with a free and appropriate public education." (*Id.* at 206). Plaintiffs further elicited testimony from their expert, Dr. Pipan, who testified beyond the scope of her report with respect to "her opinion as to how a 1:1 aide should assist B.V. as opposed to whether B.V. should have a 1:1 aide [at all]." (*Id.*).

### B.  Conclusions of Law

Having afforded due weight to the factual findings articulated in the ALJ's Final Decision, the Court next reviews *de novo* the ALJ's legal conclusions and applications of law. *See Moorestown Twp. Bd. of Educ. v. S.D. ex rel. M.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). To this end, the Court must assess (i) whether the issues Plaintiffs attempted to raise later in the due process proceedings indeed fell outside the scope of the First and Second Petitions; and (ii) whether the Board's voluntary provision of the demanded programming and services rendered the Petitions moot. The Court addresses each question in turn.

#### i.  *Scope of Proceedings*

Under the IDEA, the party who requests a due process hearing is expressly prohibited from raising "issues at the due process hearing that were not raised in the [administrative complaint], unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B); *see also id.* § 1415(i)(2)(A) (providing that a party "shall have the right to bring a civil action *with respect to the complaint presented*." (emphasis added)); *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 186 n. 14 (3d Cir. 2009) ("[A] party seeking judicial relief from the decision of state administrative proceedings may do so only to the extent that the party sought such relief in those proceedings."). Without the consent of the opposing party, "a due process complaint limits the scope of the issues that may be raised at the due process hearing and later reviewed in court." *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 146 (3d Cir. 2022). Thus, to properly introduce new claims into the proceedings, an IDEA plaintiff must either (1) seek leave to further amend their due process petitions; or (2) assert the claims by way of a separately filed due process petition. *See id.*

To claim, as Plaintiffs later attempted here, that a child has been denied a FAPE by reason of an inadequate or inappropriate IEP, is a legally distinct claim, and one which sounds in a substantive violation of the IDEA. *See, e.g., Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir. 2009); *see also J.Q. v. Washington Twp. Sch. Dist.*, 92 F. Supp. 3d 241, 252 (D.N.J. 2015) (observing distinction between claims that "challenge the implementation of an IEP" as opposed to "substantive claims for failure to provide a FAPE"). Here, however, Plaintiffs alleged nothing of the sort. Indeed, Plaintiffs' First Petition objected to the proposed Kindergarten IEP and demanded that B.V. be placed in a general education setting with a 1:1 aide. In other words, by challenging a proposed IEP, the First Petition did not—and indeed, could not—demand anything beyond prospective injunctive relief. *See, e.g., C.H.*, 606 F.3d at 66 ("[A] plaintiff alleging only that a school district has failed to comply with a procedural requirement of the IDEA, independent of any resulting deprivation of a FAPE, may only seek injunctive relief for prospective compliance."); *see also Jalen Z. v. Sch. Dist. of Philadelphia*, 104 F. Supp. 3d 660, 669 (E.D. Pa. 2015) ("Procedural violations of the IDEA, particularly in relation to an IEP, typically only justify prospective injunctive relief, not compensatory relief or tuition reimbursement.").

Moreover, Plaintiffs never sought leave to amend their First or Second Petitions to include these newly surfaced issues, despite having ample opportunity to do so. Rather, shortly after Ms. Ragsdale's testimony, Plaintiffs apparently recognized that these claims were indeed being untimely raised and elected instead to file a new due process petition in January 2021, which initiated a separate administrative proceeding.[14] *See* Def.'s SMF ¶ 14. That this petition tellingly raised the very claims and issues that Plaintiffs attempted to shoehorn into the underlying

---

[14] The Court notes that Plaintiffs have also appealed the administrative decision on those claims as well. That appeal is also pending before this Court. *See F.V. et al. v. Cherry Hill Township Board of Education Members et al.*, No. 1:22-cv-04401-KMW-SAK.

proceedings only confirms that they exceeded the scope of their Petitions. For this reason, and for those articulated above, the Court finds that the ALJ correctly excluded these matters from the proceedings.[15]

### ii. *Mootness*

Next, the Court considers whether the Board's voluntary provision of the demanded programming and services rendered the Petitions moot.

"A case becomes moot . . . when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). Stated differently, mootness occurs when "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (internal quotation marks omitted). However, courts are generally reluctant to deem cases moot "because of some action [a defendant] took unilaterally after the litigation began." *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020). The concern, of course, is the prospect of a defendant reengaging in the allegedly unlawful acts. *See Rendell v. Rumsfeld*, 484 F.3d 236, 242 (3d Cir. 2007) ("That is to say if we were to hold

---

[15] For these reasons, the Court also denies Plaintiffs' pending "Motion to Amend/Consolidate" (ECF No. 24), which effectively seeks to join together this appeal with that taken in the later-filed petition, which is also before this Court, though still in the pleadings stage. Ignoring for a moment the potentially improper motives driving Plaintiffs' case here, *see* n.17 *infra*, Plaintiffs had numerous opportunities during the underlying proceedings to seek leave to amend their Petitions. Indeed, the ALJ granted Plaintiffs leave to amend in October 2021, over the Board's objection, at a time when they were undoubtedly aware of these new issues. Instead, Plaintiffs forced the due process proceedings forward, and despite apparently knowing that these issues were indeed beyond the scope of those proceedings. That Plaintiffs continued to litigate Petitions that were quite clearly mooted only invites further suspicion. And yet, in spite of all of this, Plaintiffs have not come forward with any explanation, much less a reasonable one, that can shed light on either their delay or their failure to seek leave to amend. Beyond unnecessarily protracting this litigation, these failures have undoubtedly prejudiced the Board insofar as it was apparently forced to expend time and resources litigating numerous issues across several proceedings—all of which could have been prevented with even the most elementary diligence. Resolution of this matter is long overdue, and the Court sees no reason as to why it should be delayed any further. Thus, Plaintiffs' Motion to Amend/Consolidate is denied. *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (holding that denial of leave to amend was appropriate where plaintiff had "numerous opportunities" to amend her pleadings but "failed to take advantage of them"); *Borough of Olyphant v. PPL Corp.*, 153 F. App'x 80, 82 (3d Cir. 2005) ("It is within a district court's broad discretion to deny a motion to consolidate if it would cause delay in one of the cases, or if one of the cases is further into discovery than the other case.").

such a case moot the courts would be compelled to leave the defendant free to return to his old ways." (internal quotation marks omitted)). Thus, the "key question" regarding this barrier to mootness is whether the defendant "could reasonably be expected to engage in the challenged behavior again," such that prospective relief would be warranted. *Hartnett v. Pa. State Educ. Assoc.*, 963 F.3d 301, 306–07 (3d Cir. 2020); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("Voluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'").

Here, the Court holds that the First and Second Petitions were indeed moot, and that the ALJ did not err in dismissing them. Prior to the start of the 2020–2021 school year, the Board not only committed itself to providing B.V. with all of the relief Plaintiffs demanded, but it also demonstrated that it had been long honoring that commitment. Having thoroughly reviewed the administrative record, the Court was unable to locate any evidence suggesting that the Board might have unilaterally returned B.V. to a self-contained setting, removed her 1:1 aide, and/or declined to provide any of the other services—all of which she had been actively receiving and benefiting from. The very fact that the Board memorialized this commitment in the Finalized Kindergarten IEP confirms that any of this was incredibly unlikely to occur. *See Brill v. Velez*, No. 1:13-CV-05643, 2015 WL 374977, at *2 (D.N.J. Jan. 28, 2015) (finding claims for injunctive relief mooted where agency had already provided petitioner with the demanded relief). Because Plaintiffs received the very prospective injunctive relief they demanded, it was thus impossible for the ALJ to grant anything further. *See Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (holding that equitable relief is available only to the extent that there is an "actual controversy among the parties") ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy

regarding [equitable] relief . . . if unaccompanied by any continuing, present adverse effects."
(internal quotation marks omitted)).

With respect to Plaintiffs' demand for make-up speech therapy sessions, the Court finds
that it no longer presented an actual controversy and was thus properly dismissed as moot. A "live"
controversy entails "a real and substantial controversy admitting of specific relief through a decree
of a conclusive character, as distinguished from an opinion advising what the law would be upon
a hypothetical state of facts." *California Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 F. App'x
340, 345 (3d Cir. 2010). A live controversy further requires "not only the possibility of awarding
relief, but also a real dispute between the parties about the facts or the law." *Hartnett*, 963 F.3d at
308. But here, there was no such dispute. It was never contested that B.V. was entitled to the
services under the IDEA's stay-put provision. Nor did the Board ever resist providing B.V. with
make-up sessions. To the contrary, the Board had actively attempted on several occasions to make-
up sessions, but were inexplicably rebuffed at every turn by Plaintiffs and their counsel. Thus, to
the extent Plaintiffs claim that B.V. had not yet been provided with those sessions, the record quite
clearly demonstrates that it was solely due to their refusal to cooperate.

If a "real and substantial controversy" means anything, it surely does not entail a plaintiff's
illogical refusal of services that are readily available for the taking. *See C.H. v. Cape Henlopen
Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010) (noting that the IDEA's stay-put provision does not
"excuse [ ] [p]arents . . . from continuing to meet with [a] District to rectify the perceived wrong.");
*see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 185 n.1 (2016) (Alito, J., dissenting) ("A
plaintiff cannot thwart mootness by refusing complete relief presented on a silver platter."). For
all of these reasons, the ALJ's Final Decision is affirmed. *See Goldstein v. Equitable Life Assur.
Soc. of the U.S.*, No. 05-4766, 2007 WL 4322962, at *3 (D.N.J. Dec. 6, 2007) (finding claims moot

where defendant had "fully complied with all of [p]laintiff's demands" and "eliminated the basis for [p]laintiff's claims").

### C. Attorney's Fees

The Court is mindful that a dismissal based on mootness does not necessarily extinguish a plaintiff's other potential entitlements to relief under the IDEA. *See D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 501 (3d Cir. 2012) (holding that IDEA claims dismissed as moot did not automatically extinguish a plaintiff's right to compensatory education). Having addressed Plaintiffs' demands for prospective injunctive relief and compensatory education, the Court next addresses whether Plaintiffs, notwithstanding the mootness of their Petitions, are nevertheless entitled to an award of attorney's fees under the IDEA. *See Wheeler by Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 139 (3d Cir. 1991) (holding that a plaintiff may be entitled to an award of attorney's fees "even though the plaintiff [did] not ultimately succeed in securing a favorable judgment").

The IDEA contains a fee-shifting provision which permits a court, in its discretion, to "award reasonable attorney's fees . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). In order to be deemed a "prevailing party" under the IDEA, a plaintiff must obtain (1) a "material alteration of the legal relationship of the parties" that is (2) "judicially sanctioned." *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017); *see also D.F.*, 694 F.3d at 501. A plaintiff "must be 'successful' in the sense that it has been awarded some relief by a court." *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852–53 (3d Cir. 2006) (quoting *Buckhannon Bd. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001)). Though, a defendant's "voluntary change in conduct . . . lacks the necessary judicial imprimatur on the change." *Buckhannon*, 532 U.S. at 598–99.

### i.  <u>First and Second Petitions</u>

With respect to the First and Second Petitions, the Court finds that Plaintiffs are not entitled to an award of attorney's fees for at least two reasons. First, Plaintiffs cannot be considered "prevailing parties" under the IDEA because the Board's provision of the relief sought cannot reasonably be attributed to the underlying action. The administrative record demonstrates that the Board had continuously attempted to accommodate Plaintiffs' demands in a manner that was, albeit unmatched, voluntary, cooperative, and professional. And even if it could be said that the Board's voluntary concessions were motivated, in part, by the Plaintiffs' Petitions, those concessions would still lack the "judicial imprimatur" necessary to merit an award of attorney's fees. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 232 (3d Cir. 2008) (holding that a plaintiff does not become a prevailing party "solely because his lawsuit causes a voluntary change in the defendant's conduct").

Second, an award of attorney's fees is also not warranted because the ALJ's Final Decision lacks the fundamental indicia of judicially sanctioned relief. The Third Circuit has recognized that a change in the legal relationship between parties is "judicially sanctioned" where an ALJ's decision, among other things, "contain[s] mandatory language" and "provide[s] for judicial enforcement." *John T. ex rel. Paul T. v. Delaware Cnty. Intermediate Unit*, 318 F.3d 545, 558 (3d Cir. 2003). Here, the ALJ's Final Decision does not provide for any IDEA relief, much less order an enforceable provision of relief. *Cf. J.L. v. Harrison Twp. Bd. of Educ.*, No. 14-2666 RMB/JS, 2015 WL 5032667, at *9 (D.N.J. Aug. 25, 2015) (finding ALJ's order was judicially sanctioned despite dismissal because it directed the parties to comply with certain terms). As such, Plaintiffs are not "prevailing parties" under the IDEA, and are thus not entitled to an award of attorney's fees in connection with their First and Second Petitions.

ii. ***Emergent Relief Petition***

The Amended Complaint also demands an award of attorney's fees in connection with the ALJ's July 16, 2020 Final Decision, which granted Plaintiff's Emergent Relief Petition and ordered that the Pre-School IEP "remain as stay-put during the pendency of [the] proceeding." (ECF No. 11-1 at 98). But the Third Circuit has recognized that stay-put orders that merely preserve supplemental services previously provided by a school district do not confer "prevailing party" status under the IDEA. *John T.*, 318 F.3d at 556. Thus, Plaintiffs are not entitled to attorney's fees in connection with their Emergent Relief Petition.[16]

For all of the reasons stated above, the Court finds that Plaintiffs have not demonstrated an entitlement to attorney's fees with respect to the First, Second, or Emergent Relief Petitions, and summary judgment is therefore granted.[17]

---

[16] Separately, the Court notes that IDEA plaintiffs may indeed be "prevailing parties" when a stay-put order provides for certain retrospective claims for relief, such as for compensatory education. *See M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017). Here, however, the ALJ's Order never compelled the Board to provide make-up speech therapy sessions, but rather only ordered stay-put relief. Indeed, the ALJ only observed that the record did "not reflect whether the speech services [had] in fact been provided to B.V." (ECF No. 11-1 at 99).

[17] Even if Plaintiffs could be entitled to attorney's fees under the IDEA, the Court would likely be constrained to reduce, or even outright deny, any such award due to the conduct of their counsel, Jamie Epstein. *See* 20 U.S.C.A. § 1415(f)(i) (requiring court to reduce attorney's fees where parents' attorney, "during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy"). The administrative record unambiguously demonstrates that Mr. Epstein engaged in a pattern of conduct that was obstructive, unreasonable, illogical, and above all, unnecessary. Mr. Epstein's questionable tactics are well-known in this Circuit. Indeed, many courts have observed Mr. Epstein's apparent habit of unnecessarily protracting litigation in an effort to inflate his legal fees—all in the name of vulnerable children and their parents, whose interests he is ethically bound to place above his own. *See J.L. v. Harrison Twp. Bd. of Educ.*, No. 14-2666, 2016 WL 4430929, at *18 (D.N.J. Aug. 19, 2016) ("This Court reiterates its finding that Mr. Epstein has unnecessarily and unreasonably protracted the resolution of this litigation for years. What's more, he has done so in an unprofessional, at times unethical, and hostile manner."); *J.T. ex rel. A.T. v. Medford Bd. of Educ.*, 118 Fed. App'x. 605, 607 (3d Cir. 2004) (affirming district court's decision that Mr. Epstein and his clients were not entitled to any fees because they unreasonably and unnecessarily delayed the resolution of the controversy); *M.G. v. E. Reg'l High Sch. Dist.*, 386 F. App'x 186, 188–89 (3d Cir. 2010) ("[T]he quality of Epstein's representation in this case was woeful. Furthermore, the hours Epstein billed were not only excessive, but also either grossly negligent or fraudulent."); *A.S. v. Harrison Twp. Bd. of Educ. & E. Greenwich Sch. Dist.*, No. 14-147, 2017 WL 1362025, at *1 (D.N.J. Apr. 12, 2017) ("Disappointingly, the undersigned must now join an ever-growing chorus of judicial colleagues who have found Mr. Epstein's billing and recordkeeping practices inadequate and unprofessional."). Here, Mr. Epstein's failure to oppose the Board's Motion—in an action that appears by any reasonable measure to have been unnecessary—only confirms that he has forced yet another court, "once again,

## V.     CONCLUSION

For all of the reasons articulated above, the Board's Motion for Summary Judgment is granted, and the ALJ's Final Decision is accordingly affirmed.


Dated: March 28, 2023                              */s/ Karen M. Williams*
                                                  KAREN M. WILLIAMS
                                                  United States District Judge

---

to divert its precious limited resources from the hundreds of other cases on its docket in need of attention." *J.L. v. Harrison Twp. Bd. of Educ.*, No. CV 14-2666, 2017 WL 1954535, at *6 (D.N.J. May 11, 2017).